Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers Compensation Act.
2. Home Indemnity Insurance Company was the carrier on the risk for the period from 1 January 1991 to 1 March 1995. The Travelers Insurance Company was the carrier on the risk beginning on 1 March 1995 and remained on the risk as of the hearing before the Deputy Commissioner on 16 July 1999.
3. An employment relationship existed between plaintiff and employer-defendant (Permaflex Southern/SCAPA Group Incorporated).
4. In the event the claim is found compensable, the parties have agreed that defendants are entitled to a credit for disability benefits received by plaintiff beginning 1 February 1995 and continuing for twenty-six(26) weeks at the rate of $110.00 per week. Plaintiff has also acknowledged that defendants are entitled to credit for a period during which plaintiff received unemployment benefits.
5. Plaintiff is not filing a claim for any psychiatric or psychological conditions.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 44 year old divorced male, living by himself in Rowan County and having two dependent children.
2. In January 1981, plaintiff began work for defendant-employer Permaflex as a stripper grinder. He worked in that position until January 1987, when he became an extruder operator. Defendant-employer Permaflex is a manufacturer and processor of rubber.
3. As an extruder operator, plaintiff was exposed to various chemicals in the rubber extrusion process including ethyl methal ketone, toluene, trichloride, perk, zinc, striate, and propane fumes. The area in which plaintiff worked was in a large non-partitioned building, 50 to 70 feet wide and 150 feet long with a 24 foot ceiling. The area in which plaintiff performed his job was ventilated by a three foot diameter overhead fan which was approximately 20 feet over the extruder. There was also a five foot diameter wall fan which was located approximately 20 to 25 yards from the extruder. Plaintiff also used portable fans which he placed behind him to attempt to blow the smoke arising from the extruded rubber away from his person.
4. Prior to his employment with defendant-employer Permaflex, plaintiff held several positions involving exposure to dust, gases or both, including doing special weapons work in Germany with exposure to diesel fuel and gas, driving a milk tanker with exposure to diesel exhaust fumes, working for Cannon Mills as a spinner involving exposure to dust and propane fumes, and working at Servomation in Charlotte as a purchasing clerk which involved exposure to dust.
5. Prior to becoming employed with defendant-employer Permaflex, plaintiff developed a recurrent respiratory condition. Plaintiffs application for work with defendant-employer Permaflex revealed bibasilar rails.
6. Plaintiff testified that he began smoking at approximately age 17 and smoked two packs a day for at least 20 years. After quitting cigarettes, plaintiff continued to smoke cigars. Plaintiff was diagnosed and treated for asthma as a child.
7. Plaintiff testified before the Deputy Commissioner that he generally had a recurrent problem with breathing which manifested itself during the winter months. During the period of approximately nine years between the 1988 medical records describing the respiratory condition and the 1997 hearing before the Deputy Commissioner, there was consistent evidence of plaintiffs recurrent respiratory condition manifesting itself during the winter months.
8. Due to internal and external nasal obstructions, plaintiff underwent an open septo-rhinoplasty on 30 May 1988.
9. During the winter months of 1988-1989, plaintiffs family physician, Dr. Max Whicker, treated plaintiff for severe asthma and bronchitis and took him out of work for a week and then again for four days at a later point.
10. During the winter of 1989-1990, plaintiff saw Dr. W.R. Thompson who found inflamed bronchi in the right chest. Plaintiff was out of work for four days per Dr. Thompsons recommendation.
11. Beginning in 1991 or 1992, plaintiff began experiencing flu-like symptoms, with one major sickness each year. The first year, plaintiff was out of work due to his symptoms approximately two weeks. By the fifth year, plaintiffs symptoms had worsened to the point where plaintiff was out of work several months. During the winter of 1990-1991, plaintiff was seen by Dr. Wicker, who took plaintiff out of work in January due to asthma and an upper respiratory infection. Dr. Wicker began prescribing the antibiotic Suprax and Proventil, a bronchial dilator due to complaints of wheezing.
12. During the winter of 1991-1992, Dr. Wicker again treated plaintiff for complaints of diffuse congestion and wheezing. His complaints included production of green sputum, pain in the lungs, sore throat, tickling in the back of the neck and fatigue.
13. In the winter of 1992-1993, plaintiff was again treated by Dr. Wicker who found a mild diffused wheezing and cough. Dr. Wicker treated plaintiff in January of 1993 for asthma, bronchitis, with a cough productive of green sputum. Plaintiff was seen by Dr. Wicker for mild diffuse congestion in the lungs. Dr. Wicker noted that plaintiff was still smoking despite Dr. Wickers recommendation that he quit.
14. In the winter of 1994-1995, plaintiff was still being treated by Dr. Wicker for chest congestion. Dr. Wicker took plaintiff out of work during January of 1995. Dr. Wicker took plaintiff out again on 7 February 1995 to 13 February 1995, due to chest congestion with a cough. Plaintiff was still smoking according to Dr. Wickers notes in February of 1995.
15. Plaintiff was referred by Dr. Wicker to Dr. Proctor for a visit on 28 February 1995. Dr. Proctor noted that plaintiff "gets bronchitis every year at this time. Dr. Proctors notes include the report that plaintiff had had an upper respiratory infection every year for the past five years. Plaintiff admitted to Dr. Proctor, smoking five cigars a day as of that visit in late February 1995. Dr. Proctor opined in his report of 8 March 1995, that plaintiff may have a viral syndrome. Accordingly, he referred plaintiff to Dr. Christopher Agner, a specialist in infectious diseases.
16. On or about 13 April 1995, plaintiff reported to defendant-employer Permaflex an alleged injury or occupational disease occurring as of 31 January 1995, from exposure to various chemicals with which he worked in the extruder process.
17. In March 1995, Dr. Agner diagnosed plaintiff with bronchitis. Among Dr. Agners recommendations was that plaintiff completely exclude cigars as his long-term health depended upon the same.
18. In February 1995, Dr. Stephen Proctor diagnosed plaintiff with bronchitis. Dr. Proctor noted that plaintiff had a history of smoking, but as of the date of his diagnosis, plaintiff was only smoking five cigars a day. Dr. Proctors notes stated that plaintiff usually got a severe infection each Christmas or January and that he had had walking pneumonia several times.
19. In 1995, plaintiff took a medical leave of absence from his employment and in June returned to work for approximately three and one-half days before he began experiencing symptoms again. In March of 1995, plaintiff was admitted to Cabarrus Memorial Hospital for bronchitis and dyspena and was treated by Dr. Christopher Snyder.
20. While in Cabarrus Memorial Hospital, Dr. Douglas G. Kelling was brought in as a consultant regarding plaintiffs recurring asthma, bronchitis and pneumonia. Dr. Kellings assessment was probable hyperreactive airway disease (asthma) exacerbated by his exposure to multiple chemicals on his job leading to secondary bacterial infection.
21. On 25 July 1995, Dr. Kelling informed defendant-employer that plaintiff should not work around chemicals unless he wore a self contained respirator to prevent inhalation of chemicals. At no time was plaintiff provided a self-contained breathing apparatus.
22. In August 1995, plaintiff was treating with Dr. Kelling, who also noted that plaintiff was still smoking. He allowed plaintiff to return to work with defendant-employer Permaflex. Plaintiff did not return to work. Plaintiffs last contact with defendant-employer Permaflex regarding his return to work intentions occurred on 23 August 1995. As defendant-employer Permaflex had received no word from plaintiff in almost two weeks, plaintiff was terminated on 12 September 1995.
23. After his termination, plaintiff filed for unemployment benefits and acknowledged in the hearing for said benefits that he was aware of defendant-employer Permaflexs policy regarding calling in. During that hearing, plaintiff represented to the Employment Security Commission that he would accept suitable work. Mr. Cinquemani, a counselor with the North Carolina Vocational Rehabilitation, conferred with Dr. Schafer about plaintiffs ability to work at that point and Dr. Schafer opined that plaintiff could work.
24. From March of 1996 to October of 1996, plaintiff attended Central Piedmont College Community College, enrolled in office and computer courses, and completed an apprenticeship in general bookkeeping and accounting. Plaintiff maintained a 3.81 G.P.A.
25. Following completion of the program at Central Piedmont Community College, plaintiff registered with various temporary agencies and was available for temporary assignments.
26. Griffin Services, Inc. ("Griffin) was one of several temporary agencies with which plaintiff registered for temporary job assignments.
27. Plaintiff was assigned to various office jobs from 9 October 1996 through 14 March 1997 by Griffin, including Cadmus Communications in Charlotte, North Carolina, from 28 October 1996, until 29 January 1997, in the shipping office where his duties included packing, shipping and operating a computer.
28. During the winter of 1996 1997, plaintiff sought treatment with Dr. Cannon and again described symptoms of reactive airway disease, which had been present intermittently over the previous five years during the winter months. Dr. Cannon diagnosed acute bronchitis.
29. In December of 1996, plaintiff caught a cold which turned into flu which led to respiratory problems.
30. Plaintiff was out of work from 29 December 1996 through 13 January 1997 due to respiratory illness and the associated symptoms. Plaintiff acknowledged in his testimony that there were certain fumes present during his employment with Cadimas. Plaintiff also testified that he requested a respirator while working at Cadimas, and that when he requested this accommodation, Cadimas terminated its contract with Griffin Temporary Services through whom plaintiff had obtained the position.
31. In May 1997, plaintiffs pulmonary function tests were normal. Dr. Kelling concluded that there was no evidence that plaintiff had any permanent or disabling pulmonary impairment in May 1997.
32. On 30 April 1998, Dr. Kelling stated: "Mr. Ricky Hudson is followed by me for recurrent respiratory infections and chronic bronchitis due to cigarette smoking. If he continues to smoke, it is felt this medical condition will continue until his death. If he stops smoking, it is uncertain how long his respiratory problems will persist.
33. Plaintiff was advised by numerous doctors to stop smoking cigars as well as cigarettes; however, he was still smoking cigars occasionally at the time of the hearing of this matter before the Deputy Commissioner.
34. The North Carolina Department of Human Resources began monitoring the workplace of defendant-employer Permaflex in 1990 for exposure to dust and chemicals and made no recommendations regarding the area in which the plaintiff worked.
35. Air quality studies conducted on more than one occasion at defendant-employer Permaflex while plaintiff worked there returned within normal and/or acceptable limits.
36. Plaintiffs job did not cause or significantly aggravate his respiratory or reactive airways disease. Plaintiffs job did not place him at an increased risk of developing respiratory problems or reactive airways disease or of significantly aggravating these conditions over the general public not so employed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. The condition at issue in this case is not an enumerated occupational disease under N.C. Gen. Stat. 97-53. Accordingly, in order to qualify as a compensable occupational disease, it must be shown that it meets the standard set forth in N.C. Gen. Stat. 97-53(13). In order for a disease to constitute a compensable occupational disease under the statute, the condition must be due to causes and conditions characteristic of and peculiar to particular trade or occupation or employment involved, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment. N.C. Gen. Stat. 97-53(13).
2. Plaintiff has not met his burden of showing that his occupation caused or significantly contributed to the development of or significantly aggravated his pre-existing respiratory condition or that his occupation placed him at a greater risk than that of the general public of developing his condition. Therefore, plaintiff has failed to prove that he contracted a compensable occupational disease under the meaning of the North Carolina Workers Compensation Act during his employment with defendant-employer Permaflex as insured by either Home Indemnity Insurance Company or the Travelers Insurance Company, or during his employment with Cadimus through Griffin Temporary Services as insured by Atlantic Mutual Insurance Company. N.C. Gen. Stat. 97-53(13). Bookerv. Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979); Keller v. City ofWilmington, 65 N.C. App. 675, 309 S.E.2d 543 (1983); Keel v. H V,Inc., 107 N.C. App. 536, 421 S.E.2d 362 (1992).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiffs claim for workers compensation benefits is hereby DENIED.
2. Each party shall bear its own costs.
 ***********
This the day of January, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER